IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

NÉSTOR LUIS MORENO-LAGARES,

    Plaintiff,

       v.

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

CIVIL NO. 13-1257 (MEL)

**OPINION AND ORDER**

**I.   PROCEDURAL HISTORY**

Néstor Luis Moreno-Lagares ("plaintiff" or "claimant") was born in 1979 and has completed high school and one year of college. (Tr. 24.) Prior to his initial application for Social Security disability benefits, plaintiff had worked as a men's and boy's clothing salesperson between March 11, 1991 and October 4, 2006. Id. On March 29, 2010, plaintiff filed an application for Social Security disability benefits, alleging disability on the basis of, *inter alia*, arterial hypertension, congenital stenosis of the aortic valve, and depression. (Tr. 18.) The alleged onset date of the disability was June 20, 2007 and the end of the insurance period was September 30, 2012. (Tr. 16.)  Plaintiff's application was denied initially on August 5, 2010 and upon reconsideration on March 7, 2011. Id.

Plaintiff made a request for a hearing before an Administrative Law Judge ("ALJ"), which took place on October 12, 2011. (Tr. 30.) Dr. Ariel Cintrón ("Dr. Cintrón"), a vocational expert ("VE"), provided testimony at the hearing. (Tr. 30.) The ALJ rendered a decision on October 14, 2011, denying plaintiff's claim. (Tr. 16.) The Appeals Council denied plaintiff's request for review on February 5, 2013. (Tr. 1.) Therefore, the ALJ's opinion became the final

decision of the Commissioner of Social Security (the "Commissioner" or "defendant"). On March 8, 2013, plaintiff filed a complaint seeking review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), alleging that the ALJ's decision was not based on substantial evidence. Both plaintiff and defendant have submitted memoranda of law. ECF No. 17; 18.

## II.   STANDARD OF REVIEW

The Social Security Act (the "Act") provides that "[t]he findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the] conclusion." Irlanda-Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)). The Commissioner's decision must be upheld if the court determines that substantial evidence supports the ALJ's findings, even if a different conclusion would have been reached by reviewing the evidence *de novo*. Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981). The Commissioner's findings of fact are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

For purposes of the Act, a claimant is deemed to be disabled if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Claims for disability benefits are evaluated according to a five-step sequential process. 20 C.F.R. § 404.1520 (2012); Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804 (1999). If it is determined that the claimant is not disabled at any

step in the evaluation process, then the analysis will not proceed to the next step. If the ALJ concludes in steps one through four that the claimant's impairment or impairments are severe and do prevent him from performing past relevant work, the analysis then proceeds to step five. At this final step, the ALJ evaluates whether the claimant's residual functional capacity ("RFC"),[1] combined with his age, education, and work experience, allows him to perform any other work that is available in the national economy. 20 C.F.R. § 404.1520(a)(4)(v). If the ALJ determines that there is work in the national economy that the claimant can perform, then disability benefits are denied. 20 C.F.R. § 404.1520(g).

Under steps one through four, the plaintiff has the burden to prove that he cannot return to his former job because of his impairment or combination of impairments. Ortiz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989) (per curiam). Once he has carried that burden, the Commissioner then has the burden under step five "to prove the existence of other jobs in the national economy that the plaintiff can perform." Id.

### III. MEDICAL EVIDENCE SUMMARY

The certified administrative record contains the following medical evidence concerning plaintiff's medical conditions:

#### A. Mental Health Evidence

Plaintiff was admitted to Damas Hospital ("Damas") on September 1, 2009 for anxiety, and referred to the Community Cornerstone of Puerto Rico ("Community Cornerstone") in order to receive a psychiatric evaluation. Upon discharge on September 2, 2009, the evaluating physician at Community Cornerstone commented that plaintiff denied suicidal thoughts at the moment and that he appeared alert and cooperative. (Tr. 104.) Plaintiff was admitted on

---

[1] An individual's RFC is the most that he can do in a work setting despite the limitations imposed by his mental and physical impairments. 20 C.F.R. § 404.1545(a)(1).

September 8, 2009 at the First Hospital Panamericano with severe depression, acute sadness, and poor judgment. Plaintiff was discharged on September 17, 2009. (Tr. 82-85.) On October 13, 2009, plaintiff was once again hospitalized at First Hospital Panamericano for severe depression symptoms including anhedonia, suicidal thoughts, hallucinations, and poor impulse control. The discharge notes dated October 19, 2009, reveal that plaintiff responded well to medication and that he was alert, coherent, and aware. (Tr. 136-37.)

Plaintiff was treated in the Outpatient Clinic of the First Hospital Panamericano on October 23, 2009. Plaintiff's condition worsened and he was transferred to the emergency room to then be admitted to a psychiatry unit due to his suicide risk. (Tr. 177.) On November 17, 2009, plaintiff sought emergency treatment at the Crisis Stabilizing Unit ("CSU") at Community Cornerstone for agitation, hallucinations, anxiety and suicidal thoughts. The psychiatric evaluation notes that plaintiff responded well to antipsychotic medication; he was described as alert, cooperative, oriented, and free of suicidal thoughts. (Tr. 107.) Progress notes from plaintiff's follow up treatment visits at Community Cornerstone, dated from September 2009 to July 2010, show that plaintiff consistently maintained a "neat" appearance, a "cooperative" attitude; "calm" motor activity; "appropriate" affection; "normal" expression; no cognitive difficulty and he did not express suicidal thoughts. (Tr. 128-227.) On March 2, 2010, plaintiff was once again admitted to the CSU for having thoughts of death, hallucinations and threatening conduct. The psychiatric discharge evaluation indicated that plaintiff's condition stabilized and that he should continue psychiatric treatment. (Tr. 127.)

From April 15 through April 21, 2010, claimant was admitted to First Hospital Panamericano due to "severe depression with handicap," anhedonia, suicidal thoughts, poor impulse control and poor judgment. (Tr. 114.) The discharge summary indicated that plaintiff

was alert, coherent, and no longer had suicidal thoughts. (Tr. 116.) It was recommended that plaintiff engage in physical activity "as tolerated" and that he should not drive while taking medications. Id.

On June 17, 2010, physician Dr. Nilma Rosado Villanueva ("Dr. Rosado") evaluated plaintiff, assessing that he has "very poor concentration capacity and has memory impairment." (Tr. 663-64.) On July 12, 2010, Dr. Luis Toro ("Dr. Toro") completed a consultative examination report, indicating that plaintiff was coherent and oriented and that he did not appear to be in physical or emotional distress. Dr. Toro also noted that plaintiff showed no evidence of "unusual or bizarre behavior or suicidal or homicidal tendencies," was "in good contact with reality," and that his "attention, concentration, and retention [were] slightly diminished." He commented that plaintiff is able to handle funds adequately and capable of normal interpersonal relationships." (Tr. 790-91.)

On March 7, 2011, Dr. Marcos Rodríguez ("Dr. Rodríguez"), plaintiff's treating psychiatrist since September 2009, completed a mental impairment questionnaire, diagnosing claimant with a schizoaffective disorder, depressive type. (Tr. 230-236; 814-819.)[2] He assessed claimant had a Global Assessment of Functioning ("GAF") score of 34[3] and noted that he has recurrent suicidal indication, hallucinations, is worried and anxious, and isolated from his family and friends. (Tr. 230-31.) He indicated that claimant "can start a task but cannot finish, and has difficulty concentrating." (Tr. 234.) Dr. Rodríguez indicated that claimant had marked

---

[2] The English-language translation of the mental impairment questionnaire completed by Dr. Rodríguez only contains a translation of his written notes, which were originally in the Spanish language. (Tr. 814-19.) Since the English-language translation of his completed questionnaire only contains a translation of his notes, and thus does not contain the original English-language text of the questionnaire itself, (Tr. 230-236) both the original and the translation of the questionnaire have been cited in this opinion. The original questionnaire, however, is cited only for purposes of referencing the English-language text, and not for Dr. Rodríguez's Spanish-language responses.
[3] A GAF score between 31 and 40 is "characterized by some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." Halverson v. Astrue, 600 F.3d 922, 927 n.5 (8th Cir. 2010) (citing DSM–IV at 34).

limitations in activities of daily living, extreme limitations in social functioning, extreme limitations in concentration, persistence or pace, and had continual episodes of deterioration or decompensation in work or work-like settings. (Tr. 819.)

On May 26, 2011, plaintiff was admitted for four days at the Hospital Metropolitano Tito Mattei for anxiety, depression, suicidal thoughts and hallucinations. (Tr. 241.) The discharge summary indicates "patient responded adequately to treatment. He's social and cooperative. Denies suicide or homicidal ideas." (Tr. 244.)

### B. Physical Health Evidence

Plaintiff has a congenital disease of the aortic valve and has been receiving treatment with cardiologist Dr. César P. Cruz ("Dr. Cruz") since February 2002. An echocardiogram taken on June 20, 2007 revealed that plaintiff's heart dimensions were all within normal range, with the exception of his aortic valve aperture of 14 mm, which was outside the normal scope of 16-26 mm. (Tr. 453.) On June 27, 2007, an MR angiogram of the arch and thoracic aorta showed that "the aortic root, ascending and transverse portion of the aortic arch as well as the ascending thoracic aorta are normal." (Tr. 454.) On February 28, 2008, plaintiff had radiological studies conducted revealing that he has "essentially clear lungs" and "mild to moderate dilatation of ascending aorta to the level of the aortic arch. The descending aorta shows normal configuration . . . Otherwise preserved cardiac, vascular and mediastinal structures. No evidence of aortic dissection." (Tr. 450.) A follow-up chest angiogram taken on May 1, 2009 showed coarctation of the proximal descending aorta measuring 1.6 cm and no evidence of a double aortic arch, and that there was no interval change from previous examination. (Tr. 467.) A stress thallium myocardial perfusion study conducted by Dr. Cruz on April 13, 2010 showed "no scintigraphic

evidence of exercise induced myocardial perfusion defects to suggest myocardial ischemia" and the left ventricle appeared normal in size. (Tr. 549.)

On June 17, 2010, Dr. Rosado evaluated plaintiff, concluding that his cardiovascular and neuropsychiatric conditions markedly limited his functional capacities and that, at the time of the evaluation, he would be unable to perform a remunerative job. Dr. Rosado referred to the congenital cardiac condition, but did not elaborate on the limitations it imposes and did not comment on any abnormalities in her physical examination. (Tr. 663-64.)

On October 7, 2011, Dr. Cruz submitted an RFC questionnaire reporting that plaintiff has multiple cardiac symptoms and that he would not be able to lift and carry any weight. Dr. Cruz noted that plaintiff could walk 2 blocks without rest and that he could stand for one hour before needing to sit down. (Tr. 841-44.)

### IV.  LEGAL ANALYSIS

Claimant argues that the ALJ erred in his consideration of both the mental health evidence and the physical health evidence in the record. ECF No. 17. With respect to the evidence regarding his mental health condition, he argues that the ALJ erred by not giving controlling weight to the opinion of his treating psychiatrist, Dr. Rodríguez, leading to an erroneous finding that he was not disabled during the relevant period. Id. at 3-4. As to the physical health evidence, claimant argues that the ALJ erred in not giving controlling weight to the opinion of his treating cardiologist, Dr. Cruz, and consulting internal medicine specialist, Dr. Rosado. Id. at 4-5. For the reasons set forth below, the court finds that the ALJ's decision is supported by substantial evidence in the record, and the Commissioner's final decision is affirmed.

### A.     Mental Health Evidence

Pursuant to the Social Security regulations, the ALJ will evaluate all medical opinions he receives "[r]egardless of its source" unless a treating physician's opinion is given controlling weight. 20 C.F.R. § 404.1527(d) (2012). "Generally, the ALJ gives 'more weight to the opinions from the claimant's treating physicians, because these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of the claimant's medical impairments.'" Berríos Vélez v. Barnhart, 402 F.Supp.2d 386, 391 (D.P.R. 2005) (citing 20 C.F.R. § 404.1527(d)(2)). To be given controlling weight, the treating physician's opinion must be "'well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with the other substantial evidence in [the] record.'" Polanco-Quinones v. Astrue, 11-1618, 2012 WL 1502725, at *1 (1st Cir. May 1, 2012) (quoting 20 C.F.R. § 404.1527(d)(2)). The ALJ, however, is not always required to give controlling weight to the opinions of treating physicians. Barrientos v. Sec'y of Health & Human Servs., 820 F.2d 1, 2-3 (1st Cir. 1987); Rivera-Tufino v. Comm'r of Soc. Sec., 731 F. Supp. 2d 210, 216 (D.P.R. 2010). Rather, the ALJ can give less weight to a treating physician's opinion if he has good reason to do so. Pagán-Figueroa v. Comm'r of Soc. Sec., 623 F. Supp. 2d 206, 210-211 (D.P.R. 2009) (citing Carrasco v. Comm'r of Soc. Sec., 528 F. Supp. 2d 17, 25 (D.P.R. 2007)).

The only mental health evidence in the record prepared by Dr. Rodríguez is the mental impairment questionnaire he completed on March 7, 2011. (Tr. 230-236; 814-819.) The ALJ acknowledged this evidence, noting that Dr. Rodríguez, "the claimant's treating psychiatrist since September 2009, submitted a questionnaire on March 7, 2011, after the claimant was discharged from the Hospital." (Tr. 22.) The ALJ concluded, however, that "Dr. Rodríguez's medical opinion is not entitled to controlling weight because it is not well supported by

medically acceptable diagnostic techniques and considering the claimant's good response to treatment." Id. The medical impairment questionnaire instructs the individual completing it to "attach all relevant treatment notes and test results, which have not been provided previously to the Social Security Administration." (Tr. 814.) No treatment notes or test results, however, have been attached to the questionnaire in the record. Accordingly, and in light of the fact that the record before the ALJ did not contain any additional test results or treatment notes from Dr. Rodríguez that might evince his opinion is supported by medically acceptable diagnostic techniques, the ALJ did not err in declining to give controlling weight to Dr. Rodríguez's assessment in the mental impairment questionnaire.

Claimant objects to the ALJ's finding that his impairments were not severe enough to meet or medically equal one of the listed impairments in Appendix 1, Subpart P of 20 C.F.R. § 404. In order for a depressive disorder to qualify as a "severe" impairment warranting a disability determination, plaintiff must demonstrate it results in at least two of the following: (1) marked restriction of activities of daily living; (2) marked restriction in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensations. 20 C.F.R. 404, Subpt. P, app. 1 § 12.04(B). The ALJ found that plaintiff did not meet the paragraph B criteria of Listing 12.04 because he had moderate restrictions as to his daily living activities and moderate difficulties in regard to this social functioning as well as concentration, persistence or pace. (Tr. 19.) The ALJ based the daily living activities and social functioning assessment on the answers plaintiff provided to Dr. Toro during the psychiatric consultative evaluation on July 12, 2010. Id. During the evaluation, plaintiff alleged that he regularly takes care of his own needs, reads, goes to church, and interacts with his neighbors. (Tr. 790-91.) With regard to concentration, persistence or pace, Dr. Toro

noted that plaintiff was "in good contact with reality" and that his "attention, concentration, and retention [were] slightly diminished." Id. The responses provided by plaintiff during the consultative evaluation with Dr. Toro were used to assess his daily activities and social functioning, which did not require medical evidence or judgment. Claimant objects to the ALJ's adoption of Dr. Toro's opinion in favor of Dr. Rodríguez's, however, as discussed above the ALJ gave good reasons for declining to give Dr. Rodríguez's opinion controlling weight and was not bound to adopt Dr. Rodríguez's conclusions.

As the ALJ stated, "[r]epeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." (Tr. 19); see also 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C) (4). The ALJ concluded that plaintiff did not meet the repeated episodes of decompensation criterion, stating that he had "experienced one to two episodes of decompensation, each of extended duration, but has recovered well and has remained stable with treatment for most of the time." (Tr. 19.) Plaintiff alleges that the ALJ did not indicate how he inferred that plaintiff "recovered well" or "has remained stable with treatment." ECF No. 17, at 4. As to these claims, the progress notes in the record from plaintiff's follow-up treatment visits at Community Cornerstone, dated from September 2009 to July 2010, show that plaintiff consistently maintained a "neat" appearance, a "cooperative" attitude; "calm" motor activity; "appropriate" affection; "normal expression; no cognitive difficulty and he did not express suicidal thoughts. (Tr. 128-227.) Although plaintiff was hospitalized several times during that follow-up period, the hospital notes indicate positive response to treatment and stable discharges. (See Tr. 107, 136-37.) During plaintiff's latest hospitalization on record, dated May 26, 2011 at the Hospital Metropolitano Tito Mattei, the discharge summary indicates that "patient responded adequately to treatment. He's social and

cooperative. Denies suicide or homicidal ideas." (Tr. 244.) Thus, the ALJ's finding that plaintiff recovered well and remained stable with treatment most of the time is supported by evidence in the record.

Lastly, claimant contends that the ALJ failed to "explain the weight" given to his repeated hospitalizations and crisis stabilizations. ECF No. 17, at 4. "Episodes of decompensation can be inferred from documentation of the need for a more structured psychological support system (e.g. hospitalizations)." Hutchins v. Astrue, 09CV10900-NG, 2010 WL 3895183 (D. Mass. Sept. 30, 2010) (citing 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(4)). In his decision, the ALJ specifically enumerates the instances in which claimant was hospitalized and sought crisis stabilization, the reasons for such hospitalizations and stabilizations, the locations of the hospitalizations and stabilizations, and the content of the evaluations claimant received during the hospitalizations and stabilizations. (Tr. 22.) The ALJ considered this evidence in his determination that although plaintiff had experienced one to two episodes of decompensation of extended duration, as defined by the pertinent regulation, taking the hospitalizations into account he determined that plaintiff nonetheless did not meet the threshold of three episodes of decompensation within 1 year each lasting at least 2 weeks. Plaintiff does not challenge this conclusion, which the evidence in the record supports. Overall, the ALJ's decision does not evince that he erred or ignored substantial evidence in his consideration of claimant's hospitalizations and crisis stabilizations.

### B. Physical Health Evidence

Claimant argues that the ALJ erred by not giving good reasons for declining to give controlling weight to Dr. Cruz. ECF No. 17. The ALJ concluded that the opinion of Dr. Cruz, is "not entitled to controlling weight because it is not well supported by medically acceptable diagnostic techniques and it is inconsistent with the other substantial evidence of record,

11

including this own reported findings." (Tr. 22.) As discussed above with respect to the mental health evidence, lack of support by medically acceptable diagnostic techniques is considered a good reason for opting not to give controlling weight to a treating physician's opinion. Like with regard to Dr. Rodríguez's questionnaire, there are no treatment notes or test results attached to Dr. Cruz's assessment of claimant, which describes a history of claimant's illness, lists his medications and diagnoses, and summarizes his daily activities and mental status. (Tr. 790-91.) Dr. Cruz's assessment does not reference any other tests or diagnostic results in the record in support of his opinion. Overall, as with Dr. Rodríguez's opinion, the ALJ's explanation—that is not well supported by medically acceptable diagnostic techniques—provides grounds for declining to given it controlling weight.

Furthermore, inconsistency with the evidence in the record also provides grounds for denying his controlling weight to his assessment. See Carrasco v. Commissioner of Social Sec., 528 F.Supp.2d 17, 25 (D.P.R. 2007). As a preliminary matter, claimant has not cited to any evidence in the record that undercuts the ALJ's conclusion that the record was inconsistent with the opinion. In concluding that plaintiff can perform light work, the ALJ relied on heart imaging and cardiovascular examination findings that revealed minimal abnormalities. (Tr. 21.) An echocardiogram taken on June 20, 2007 revealed that plaintiff's heart dimensions were all within normal range, with the exception of his aortic valve aperture of 14 mm, which was outside the normal scope of 16-26 mm. (Tr. 453.) On June 27, 2007, an MR angiogram of the arch and thoracic aorta showed that "the aortic root, ascending and transverse portion of the aortic arch as well as the ascending thoracic aorta are normal." (Tr. 454.) Plaintiff had radiological studies conducted on February 28, 2008 revealing that he has his "descending aorta shows normal configuration . . . Otherwise preserved cardiac, vascular and mediastinal structures. No evidence

of aortic dissection." (Tr. 450.) A stress thallium myocardial perfusion study conducted by Dr. Cruz on April 13, 2010 showed "no scintigraphic evidence of exercise induced myocardial perfusion defects to suggest myocardial ischemia" and the left ventricle appeared normal in size. (Tr. 549.) In light of this evidence, the ALJ concluded that the evidence in the record was inconsistent with Dr. Cruz's opinion.

As for consulting internal medicine specialist Dr. Rosado, the ALJ determined that her diagnosis and assessment was not entitled to controlling weight stating that it is not well supported by medically acceptable diagnostic techniques, it is inconsistent with the other substantial evidence of record, and that Dr. Rosado only evaluated plaintiff once. In her June 17, 2010 assessment, Dr. Rosado referred to claimant's congenital cardiac condition, but did not elaborate on the limitations it imposes and did not comment on any abnormalities in her physical examination. (Tr. 662.) She reported only normal findings. (Tr. 664.) As the ALJ indicated, it is not apparent from the record what diagnostic techniques, if any, she used to arrive at her assessment. The ALJ did not simply conclude that Dr. Rosado was not entitled to controlling weight because she had evaluated plaintiff once, but also explained that Dr. Rosado's opinion that claimant had "markedly limited functional capacities" and "[a] the moment of th[e] evaluation was not able to perform a ruminative job" was not owed controlling weight because her opinion was unsupported by the findings she made in her physical examination of plaintiff. (Tr. 665.) As with regard to Dr. Rodríguez and Dr. Cruz, the ALJ gave good reasons for opting not to give controlling weight to Dr. Rosado's opinion, which are supported by the record. Overall, claimant's argument that the ALJ failed to give good reasons for the weight given to the opinion of Dr. Cruz and Dr. Rosado lacks merit and his decision is supported by substantial evidence.

Although the ALJ did not give Dr. Cruz or Dr. Rosado's opinion *controlling* weight, his decision reflects that he nonetheless accounted for their assessments in making his determination that plaintiff retained a RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except that he must avoid skilled and semiskilled functions. (Tr. 20.) "A finding that a treating source's medical opinion is not entitled to controlling weight does not mean that the opinion is rejected. It may still be entitled to deference and be adopted by the adjudicator." Titles II & Xvi: Giving Controlling Weight to Treating Source Med. Opinions, SSR 96-2P (S.S.A July 2, 1996). The ALJ noted the pursuant to § 404.1527, when a treating physician's opinion is not given controlling weight, the ALJ considers numerous factors in deciding the weight to give a medical opinion. (Tr. 21.) These factors include the: (1) examining relationship; (2) treatment relationship; (3) supportability; (4) consistency; (5) area of specialization; and (6) any other factors that tend to support of contradict the opinion in question. 42 C.F.R. § 404.1527(c). Pursuant to § 404.1546, the ALJ is responsible for assessing the RFC of an applicant for disability benefits. 20 C.F.R. § 404.1456(c).

In considering plaintiff's claim of disability due to his heart condition, aortic aneurism, hypertension, and nerve condition, the ALJ noted "that claimant's medical conditions have remained well controlled with occasional outpatient treatment and medication." Id. While the ALJ did not give either of the treating physician's opinion's controlling weight, the ALJ acknowledged Dr. Cruz's opinion that claimant could not lift or carry weight, stating "the undersigned finds that the claimant's symptoms impose limitations in several respects, as in his maximum exertional capacity," but continued that "the record, when considered as a whole, does not support [plaintiff's] conclusion that his symptoms prevent him from performing all work-related activities." Id. With respect to Dr. Rosado, her conclusion that his cardiovascular

condition limits his functional capacities is not specific as to what functional limitations said condition imposes, and is not necessarily inconsistent with the ALJ's conclusion that plaintiff retained the capacity to perform light work. Moreover, neither Dr. Rosado's conclusion that claimant's "functional capacities" were limited nor her conclusion that at the time of the evaluation he was unable to perform remunerative work is supported by the normal physical findings she made throughout the examination. (Tr. 664.) Additionally, given that Dr. Rosado's evaluation includes references to both plaintiff's physical health and his mental health, it is not clear from the record that she based her conclusion that he was unable to work on his physical limitations. Finally, even assuming for argument's sake that the evaluation clearly referred to plaintiff's physical limitations, the ultimate finding that an applicant for Social Security disability benefits is unable to perform remunerative work, and thus is disabled under the Act, is reserved for the Commissioner. <u>Titles II & Xvi: Med. Source Opinions on Issues Reserved to the Comm'r</u>, SSR 96-5P (S.S.A July 2, 1996). Thus, the ALJ did not err in declining to adopt her assessment. Overall, the record does not support plaintiff's contention that the ALJ ignored substantial evidence in the record in making a determination as to his physical RFC.

## V. CONCLUSION

The ALJ's decision is substantially supported by the evidence in the record. Therefore, the Commissioner's decision is hereby affirmed.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 26th day of September, 2014.

s/ Marcos E. López<br>U.S. Magistrate Judge